# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

DAMION WASHINGTON,   )
    Plaintiff,    )
         )
  v.       )  CAUSE NO.: 2:14-CV-421-PRC
         )
CAROLYN W. COLVIN,   )
Commissioner of the Social Security )
Administration,     )
    Defendant.   )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Damion Washington on November 14, 2014, and Plaintiff's Brief in Support of his Motion to Reverse the Decision of the Commissioner of Social Security [DE 17], filed by Washington on April 27, 2015. Washington requests that the Court reverse the October 23, 2013 decision of the Administrative Law Judge denying him disability insurance benefits and make a direct award of benefits. For the following reasons, the Court grants the request.

## PROCEDURAL BACKGROUND

On August 7, 2006, Plaintiff Damion Washington filed an application for disability insurance benefits as a disabled adult child, alleging disability beginning in 1989, the year he was born. In order to be approved for benefits as a disabled adult child, Plaintiff needed to show that his disability began before age 22. Plaintiff's application was denied initially and upon reconsideration. A hearing was held on June 25, 2009, before Administrative Law Judge ("ALJ") Paul Armstrong, and on September 4, 2009, ALJ Armstrong issued a decision denying the application. Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request.

Plaintiff sought judicial review, and, on July 31, 2012, this Court reversed and remanded for reconsideration of whether Plaintiff's impairments satisfied the criteria for Listing 12.05C for Mental Retardation. The Court noted that the ALJ's decision found that Plaintiff did not meet the requirements of Listing 12.05C because he did not have, in addition to "a valid verbal, performance, or full scale IQ of 60 through 70," a "physical or other mental impairment imposing an additional and significant work-related limitation of function." The ALJ found that Plaintiff's obesity and hypertension were not severe at step two, and thus found that Plaintiff did not meet the criteria of the listing. However, in the RFC, the ALJ limited Plaintiff to light exertion work without an explanation of what physical impairment required such a limitation. Because it appeared from the RFC that the ALJ had in fact determined that Plaintiff had a physical impairment that imposed an additional and significant work-related limitation of function, the Court remanded the decision for further proceedings to determine whether Listing 12.05C was met. The Court directed the Commissioner to determine whether it was necessary to obtain an additional expert medical opinion regarding medical equivalence at step three.

On remand, the Appeals Council directed the new ALJ, Henry Kramzyk, "to obtain additional medical evidence and assess and articulate an explanation as to the extent to which the claimant is limited by his obesity, particularly as it pertains to the application of Listing 12.05(c)." (AR 399). On September 5, 2013, ALJ Kramzyk held a hearing. He issued a written decision denying benefits on October 23, 2013, making the following findings:

1. Born [in 1989], the claimant had not attained age 22 as of [his birthday in] 1989, the alleged onset date.

2. The claimant has not engaged in substantial gainful activity since [his birthday in] 1989, the alleged onset date.

3.    Prior to attaining age 22, the claimant had the following severe impairment: mild mental retardation.

4.    Prior to attaining age 22, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that, prior to attaining age 22, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant is able to understand, remember, and carry-out short, simple, repetitive instructions, can sustain attention and concentration for two-hour periods at a time and for eight hours in a workday on short, simple, repetitive instructions, can use judgment in making work decisions related to short, simple, repetitive instructions, would require an occupation with only occasional co-worker contact and supervision, would require an occupation with set routine and procedures with few changes during the workday, would require an occupation with only superficial contact with the public on routine matters, would require an occupation with no fast-paced production work, but can maintain regular attendance, be punctual within customary tolerances, and perform activities within a schedule.

6.    The claimant has no past relevant work.

7.    The claimant was born [in 1989] and was 0 years old, which is defined as a younger individual age 18-49, on the alleged onset date.

8.    The claimant has at least a high school education and is able to communicate in English.

9.    Transferability of job skills is not an issue because the claimant does not have past relevant work.

10.   Prior to attaining age 22, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform

11.   The claimant has not been under a disability, as defined in the Social Security Act, at any time prior to [his birthday in] 2011, the date he attained age 22.

(401-412).

3

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

Plaintiff had a learning disability as a child and received special education in school. On March 24, 1999, when he was 10 years old and in third grade, his WISC-III full-scale IQ score was 72. Plaintiff was retested in January 2002, when he was 13 years old; his full-scale IQ score was 70, and he was reading at the second-grade level. In September 2006, when Plaintiff was 17 years old, he underwent psychological testing at the request of the Social Security Administration and obtained a full-scale IQ score of 56. Dr. Parks, the psychologist who performed the examination, indicated that Plaintiff was cooperative during the examination, but "appeared to lack consistent motivation on the exam." (AR 276). Dr. Parks recognized that Plaintiff had obtained a full-scale score of 70 on an earlier test, and stated it was "unclear as to Damion's actual level of cognitive functioning given the lack of validity of the current WAISIII scores." *Id*.

The Social Security Administration requested another psychological exam, which was performed at Mid-America Psychological and Counseling Services on November 7, 2006. The examiner recognized Plaintiff's earlier scores of 56 and 70. On this administration, Plaintiff's full-scale IQ score was 69. The examiner opined that the variation in scores was attributable to Plaintiff's "variable motivation." (AR 272).

On November 15, 2006, Dr. Kenneth Neville, a non-examining State agency psychologist, completed a psychiatric review technique form. He opined that Plaintiff had borderline intellectual

functioning, which caused mild limitations in activities of daily living and maintaining social functioning and moderate limitations in maintaining concentration, persistence, or pace. Dr. Neville indicated no episodes of decompensation. Dr. Neville also completed a mental residual functional capacity assessment and opined that Plaintiff was markedly limited in the ability to understand, remember, and carry out detailed instructions and was moderately limited in the ability to sustain an ordinary routine without special supervision, the ability to make simple work-related decisions, the ability to respond appropriately to changes in the work setting, and the ability to set realistic goals or make plans independently of others.

On February 22, 2007, Dr. Robert Coyle, a psychologist, administered an Adaptive Behavior: Street Survival Skills Questionnaire. Plaintiff was not able to show understanding of the following concepts: right, between, most, half, same, and front. Plaintiff could not identify an exit sign, a deposit money sign, a no trespassing sign, and a flammable sign; he was very poor at identifying the names of basic hand tools and had practically no knowledge of their functions; he did not understand any concepts that involved laundry sorting, cleaning, or drying; he was very limited in his understanding of basic concepts involved in health and safety as it relates to working; he could use a phone for emergency calls, but could not read a phone directory; he could tell time to the hour on a dial clock, but not to the nearest half hour or five minutes; he had trouble with timed activities and could not read a calendar; he could identify coins and dollar bills, but could not make equivalent amounts of money, make change for a dollar, or make change for several dollars; he could easily be cheated in a monetary transaction; and he could not measure liquid in cups or fractions of cups, could not read a thermometer, and could not use a ruler for measuring inches or fractions of an inch. Dr. Coyle wrote:

The previous intelligence tests that suggested Mild Mental Retardation appear to be correct . . . .  These data suggest that because of his limited intelligence and limited adaptive behavior, he is going to need a great deal of guidance and support from vocational rehabilitation if he is going to succeed in working after high school graduation. He will need a job coach, close supervision and supported employment.

(AR 223).

In April 2007, vocational counselor Connie Burchfield opined that Plaintiff had substantial limitations requiring assistance or dependent interventions in the areas of learning, capacity for independent living, and economic self-sufficiency. (AR 166). She opined that Plaintiff's condition reflected his "need for a combination and sequence of special, interdisciplinary or generic care treatment or other services that are of lifelong or extended duration and are individually planned and coordinated." *Id*. A year later, counselor Demetrius Cole repeated this opinion. (AR 509).

In March 2007, Plaintiff's treating physician, Arvind Kakodkar, M.D., completed a "Medical Information" form for purposes of vocational rehabilitation eligibility. (AR 219-20). Dr. Kakodkar listed hypertension and morbid obesity as the diagnoses, and indicated that the treatment plan was weight loss and medication. Dr. Kakodkar did not check any of the "Functional Limitations" categories of mobility, motor skills, self care, work tolerance, cognitive and learning skills, communication, interpersonal skills, self direction, and work skills. By way of example, the category of "mobility" provides:

An individual will be determined to have a serious limitation of mobility if (due to a physical or mental impairment) his or her mobility is *currently* limited to the extent that he or she *consistently* requires the assistance of one or more other individuals to meet transfer, safety supervision, or other mobility needs in situations necessary to prepare for, enter or reenter, or maintain employment in an integrated setting.

(AR 219) (emphasis in original). Dr. Kakodkar answered "yes" to the question of whether Plaintiff is able to work. (AR 220).

Following a consultative examination on December 13, 2006, Dr. Teofilo Bautista diagnosed Plaintiff with learning disability, obesity, and hypertension. (AR 250-51). At the examination, Plaintiff weighed 333 pounds. Plaintiff reported to Dr. Bautista that he is able to walk one block with shortness of breath, stand for 35 minutes with fatigue, and climb ten steps with shortness of breath. Upon examination, Dr. Bautista found no deformity of the back, good range of motion of both the upper and lower extremities, no joint pain or swelling, good grip strength in both hands, and good muscle tone, strength, and reflexes in both the upper and lower extremities. He found that Plaintiff could walk and run well without difficulty. An examination in June 2008 showed that Plaintiff was 5'6" tall and weighed 339 pounds, and obesity was noted. (AR 246). This equates to a body mass index ("BMI") of 54.7.

On May 6, 2013, R. Gupta, M.D. examined Plaintiff at the request of the agency following remand from this Court. (AR 489-92). Plaintiff was measured at 5'9" tall and weighed 265 pounds, which computes to a BMI of 39.1. On physical examination, Dr. Gupta noted that Plaintiff "walked in with a straight posture and appears comfortable in the seated and supine position." (AR 490). The musculoskeletal exam was unremarkable as were the exams of the upper extremities and the lower extremities. Plaintiff had a normal gait, was able to stoop and squat without difficulty, was able to walk heel to toe and tandemly without difficulty, was able to get on and off the examination table without difficulty and did not require any assistance, and was able to stand from a sitting position without difficulty. Dr. Gupta gave an impression of a history of learning disability and a history of obesity.

Dr. Gupta also filled out a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on May 6, 2013. (AR 494-99). He opined that Plaintiff could lift and carry 21-

100 pounds frequently, could sit for eight hours and stand or walk for four hours in an eight-hour workday. Dr. Gupta indicated that these limitations were based on Plaintiff's weight. Dr. Gupta opined that Plaintiff can reach overhead with both hands frequently; reach, handle, finger, feel, and push/pull continuously; and operate foot controls frequently. He further opined that Plaintiff can climb stairs and ramps frequently and climb ladders, balance, stoop, kneel, crouch, and crawl occasionally. These limitations were based on Plaintiff's obesity. He opined that Plaintiff can be exposed to unprotected heights occasionally and moving mechanical parts frequently.

## B. Plaintiff's Testimony

At the first hearing, Plaintiff testified that he had worked at Hardee's fast food restaurant doing maintenance, changing the garbage, and cleaning the bathroom. He worked at Hardee's two days a week for seven hours per day. He got the job through vocational rehabilitation, and his brother or his aunt would take him to work. He lost the job because his brother's car broke down and he missed two days of work. The people at Hardee's told Plaintiff's vocational counselor that while he did the work, it was difficult for him to keep up with their pace. He had the job at Hardee's for close to three months. Plaintiff testified that, after Hardee's, he got a job at McDonald's. His brother took him to the job at McDonald's also. Plaintiff worked two days a week and was supposed to be there from 11 to 5, but most days they sent him home. Sometimes they sent him home when business was slow, and sometimes they would send him home or have him switch to a less demanding job like sweeping when it was busy. They also sent him home when it was busy. Plaintiff testified that he got his job at McDonald's through a vocational rehabilitation program.

At the second hearing, Plaintiff testified that he has pain in his legs when he stands for a period of time or if he moves a lot. As of September 2013, Plaintiff worked at Trade Winds, a

rehabilitation center, making signs part time. Plaintiff testified that he was told at both McDonalds and his current job at Trade Winds that he works at a "slow pace." (AR 542). Plaintiff testified that he cleaned his room, dusted furniture, vacuumed, straightened up around the house, did the dishes, took care of personal needs, spent time on the computer, played video games, went out to eat, drove, shopped with his mother, did yard work, shoveled snow, played basketball with cousins, and went to church. In August 2012, his case facilitator, Zalikha Khamitzhanova, filled out an Individualized Support Plan and indicated that Plaintiff lost his job in June 2012 because he "walked out. He had SEFA supports, but made a poor choice and lost his job." (AR 511). The section of the Individualized Support Plan for a "proposed strategy," provides "I will learn to be patient while working on a task that might be challenging to me and/or working with people when I am upset." (AR 513).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment

for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's residual functional capacity (RFC), age, education, and experience? If yes, then the claimant is not

disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. The RFC "is an administrative assessment of what work-related activities an individual can perform despite his limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff argues that the record supports a finding of disability under Listing 12.05C at step three of the sequential analysis and requests reversal and an award of damages. He reasons that the ALJ should have found that his mild mental retardation, in combination with his obesity, meets the requirements of the Listing.

Listing 12.05C provides:

Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . . ;

C.     A valid verbal, performance, or full scale IQ of 60 through 70 *and* a physical or other mental impairment *imposing an additional and significant work-related limitation of function*;

. . . .

12

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (emphasis added); *see also Mendez v. Barnhart*, 439

F.3d 360, 361 (7th Cir. 2006) (explaining the impact of this range of IQ scores on an individual's

ability to do work and the reasoning for requiring the combination of the low IQ score and an

additional and significant physical or mental limitation).

Social Security Ruling 02-1p provides that, at step three, "when evaluating impairments

under mental disorder listings 12.05C, 112.05D, or 112.05F, obesity that is 'severe,' as explained

in question 6, satisfies the criteria in listing 12.05C for a physical impairment imposing an additional

and significant work-related limitation of function and in Listings 112.05D and 112.05F for a

physical impairment imposing an additional and significant limitation of function." SSR 02-1p.

Question 6 of Social Security Ruling 02-1p provides:

6. When Is Obesity a "Severe" Impairment?

As with any other medical condition, we will find that obesity is a "severe"
impairment when, alone or in combination with another medically determinable
physical or mental impairment(s), it significantly limits an individual's physical or
mental ability to do basic work activities. (For children applying for disability under
title XVI, we will find that obesity is a "severe" impairment when it causes more
than minimal functional limitations.) We will also consider the effects of any
symptoms (such as pain or fatigue) that could limit functioning. (See SSR 85-28,
"Titles II and XVI: Medical Impairments That Are Not Severe" and SSR 96-3p,
"Titles II and XVI: Considering Allegations of Pain and Other Symptoms In
Determining Whether a Medically Determinable Impairment Is Severe.") Therefore,
we will find that an impairment(s) is "not severe" only if it is a slight abnormality (or
a combination of slight abnormalities) that has no more than a minimal effect on the
individual's ability to do basic work activities (or, for a child applying under title
XVI, if it causes no more than minimal functional limitations).

There is no specific level of weight or BMI that equates with a "severe" or a "not
severe" impairment. Neither do descriptive terms for levels of obesity (e.g., "severe,"
"extreme," or "morbid" obesity) establish whether obesity is or is not a "severe"
impairment for disability program purposes. Rather, we will do an individualized
assessment of the impact of obesity on an individual's functioning when deciding
whether the impairment is severe.

SSR 02-1p, 2002 WL 34686281, at *4 (Sept. 12, 2002).

At step two of the sequential analysis, the ALJ on remand found that Plaintiff has the "severe" impairment of mild mental retardation but did not find Plaintiff's obesity to be a "severe" impairment. In making the latter finding, the ALJ noted that the objective medical evidence documents a level of obesity or morbid obesity dating back to 2006, with Plaintiff reporting a diagnosis of obesity in the 1990s. The ALJ then rejected Plaintiff's English teacher's 2006 opinion that Plaintiff's problems with regard to poor energy are due to his weight on the basis that she was not qualified to give this opinion and that the opinion is inconsistent with the vocational rehabilitation medical assessment proffered in March 2007 by Arvind K. Kakodkar, M.D., Plaintiff's primary care physician. The ALJ stated that Dr. Kakodkar assessed Plaintiff as having "no functional limitations in mobility and motor skills and is able to work" and that Dr. Kakodkar advised Plaintiff to lose weight and exercise. (AR 402-03).The ALJ found Dr. Kakodkar's opinion "consistent with the lack of evidence of significant ongoing impact imposed upon the claimant by his obese state." (AR 403).

The ALJ next noted that Plaintiff "'lost a healthy amount of weight over 2010 and 2011 and kept it off in 2012.'" (AR 403 (citing Ex. 18F)). That comment is in an "Individualized Support Plan" filled out by facilitator Zalikha Khamitzhanova on August 31, 2012, in a section about Plaintiff's healthcare issues. (AR 516). The ALJ then found that the lack of physical impact by the obesity is demonstrated in the medical notes and statements throughout the record from 2006 through 2013, such as that Plaintiff "[w]alks and runs well without difficulty," evidences "no chest pain or shortness of breath on exertion," and reports some balance problems with skating but is able to "keep trying [and] trying until I get it right." (AR 403 (citing Ex. 4E, 7F, 16F)). The ALJ wrote

14

that he is "unable to conclude that the claimant's obesity imposes more than a minimal impact upon his ability to engage in basic work activity." (AR 403). The ALJ also found that Plaintiff's hypertension, seasonal allergy disorder, history of meningitis, a learning disability, and leg and back pain were not severe.

Continuing on to step three, the ALJ considered the requirements of Listing 12.05C and recognized Plaintiff's valid, full scale IQ score of 69. However, the ALJ found that Plaintiff did not have the requisite additional "physical or other mental impairment imposing an additional and significant work-related limitation of function" to meet the Listing. He wrote, "As previously discussed above, the claimant's other impairments, including particularly his hypertension, obesity, and learning disability are non-severe in nature, and as such, do not impose any additional and significant work-related limitation of function." (AR 405).

Plaintiff argues that the ALJ's finding that his obesity did not cause additional and significant work-related limitation of function is contrary to the weight of the evidence and that the current record can only support a conclusion that Plaintiff's impairments satisfy Listing 12.05C. Plaintiff bears the burden of demonstrating that his impairments meet or equal a listed impairment. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

When this case was first before this Court four years ago, the primary issue was whether Plaintiff's obesity was a "severe" impairment. The prior ALJ's decision was inconsistent in its analysis of Plaintiff's obesity. The prior ALJ, like the current ALJ, did not find obesity to be a "severe" impairment at step two but nevertheless imposed physical limitations in the form of light work in the RFC assessment, suggesting that Plaintiff had some physical impairment that causes

limitations in function. Yet, the prior ALJ did not specify what impairment mandated the limitation to light work. Because of this facial inconsistency, the Court reversed and remanded for the ALJ to reconsider the issue of whether Plaintiff's obesity is "severe" and directed the ALJ to obtain a medical opinion, if necessary. On remand, the Appeals Council directed the ALJ to obtain a medical opinion, which is the opinion of consultative examiner Dr. Gupta, detailed above.

Plaintiff argues that Dr. Gupta's Medical Source Statement supports a finding that his obesity is a "severe" impairment. In his report, Dr. Gupta opined that Plaintiff's obesity would limit him to four hours of standing and walking in an eight-hour day, would limit him to only occasionally (one-third of the day) stooping, crouching, crawling, kneeling, balancing, and climbing ladders and scaffolds, and would limit his capacity to work at protected heights or around moving mechanical parts. The ALJ did not specifically discuss Dr. Gupta's Medical Source Statement or his opinion at step two, although the ALJ string cites the report (identified in his decision as Exhibit 16F) in summarizing medical findings. Thus, there is no acknowledgment at step two that Dr. Gupta's opinion, if credited, would support a finding that Plaintiff's obesity is "severe." The ALJ did not discuss Dr. Gupta's opinion until the RFC assessment, when he gave it "little weight." (AR 409-10). Although this organization may be routine in the drafting of ALJ decisions, in this case it is problematic because the Court specifically remanded for a proper consideration of whether Plaintiff's obesity was severe, including obtaining a medical opinion, if appropriate. The Appeals Council ordered the ALJ to obtain a medical opinion for the very purpose of assessing obesity and applying Listing 12.05C, yet the ALJ failed to analyze the opinion in the context of step two or step three. That the ALJ should fail to openly discuss that opinion in the context of the step two analysis is suspect.

Regardless, Plaintiff is correct that the ALJ erred in giving "little weight" to the opinion of Dr. Gupta. Factors an ALJ considers in weighing all medical opinion evidence include the examining relationship, the treatment relationship, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c)(1)-(6). "As a general rule, an ALJ is not required to credit the agency's examining physician in the face of a contrary opinion from a later reviewer or other compelling evidence." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014). However, "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

Dr. Gupta was the only doctor to examine Plaintiff and give an opinion regarding the functional limitations resulting from Plaintiff's physical impairments. Although the ALJ is correct that Dr. Gupta's opinion was based on a one-time assessment, the ALJ incorrectly used that as a basis for giving the opinion less weight under the circumstances. By its very nature, a consultative examination by a state agency doctor is a one-time event. However, this is not a case in which the ALJ is comparing a consultative examiner's opinion based on a one-time exam with a treating physician's opinion based on months or years of treatment. As analyzed below, Dr. Gupta's opinion is not inconsistent with the other medical record of evidence, including the opinion of treating physician, Dr. Kakodkar.

The ALJ found Dr. Gupta's opinion to be inconsistent with his own observations and others in the record such as full lumbar spine range-of-motion, a normal gait, walking and running well

without difficulty, able to stoop and squat without difficulty, able to mount and dismount the examination table without difficulty or assistance, good bilateral lower extremities range of motion and strength, no joint pain or swelling, and able to stand from a sitting position without difficulty. (AR 410 (citing Ex. 4F, 7F, 16F)). But, the ALJ does not explain how the functional limitations imposed by Dr. Gupta of limited standing and walking and postural activities in an eight-hour work day imposed are inconsistent with these essentially normal postural exam findings by Dr. Gupta in 2013, the physical consultative examination in 2006, and consultative psychological examination. *See* (AR 250-51, 270). Dr. Gupta specifically indicates that the functional limitations are a result of Plaintiff's obesity. In other words, Dr. Gupta's opinion goes to the ability to do sustained work over an eight-hour period, rather than the ability to perform a given physical movement upon examination. The clinical findings are also not inconsistent with Plaintiff's testimony that he gets pains in his legs if he stands or walks too long and that he could walk for only a block or two before needing to sit down. (AR 545).

Nor is Dr. Gupta's opinion inconsistent with the form completed by treating physician Dr. Kakodkar in March 2007. As discussed above, the ALJ relied largely on the March 2007 form completed by Dr. Kakodkar to find that Plaintiff's obesity is not "severe" at step two. The ALJ is mistaken in finding that Dr. Kakodkar assessed Plaintiff as having "no functional limitations in mobility and motor skills and is able to work." (AR 402-03). While the ALJ is correct that Dr. Kakodkar did not check the line next to "mobility" or "motor skills," neither the ALJ nor the Commissioner analyzed the substance of the definition of the "functional limitations" in "mobility," "motor skills," or any of the categories. Each category on the form defines only an extreme functional limitation. For the category of "mobility," the doctor is to check the line if the person's

"mobility is *currently* limited to the extent he or she *consistently* requires the assistance of one or more other individuals to meet transfer, safety supervision, or other mobility needs in situations necessary to prepare for, enter or reenter, or maintain employment in an integrated setting." (AR 219) (emphasis in original). For the category of "motor skills," the form asks the doctor to check the line if the person "*consistently* requires the assistance of one or more other individuals to hold, manipulate, operate, or otherwise utilize objects in his or her environment." *Id.* (emphasis in original). In other words, the form only asks Dr. Kakodkar whether Plaintiff requires assistance from another person at all times, or at least at a level that is generally inconsistent with competitive employment.

This is far from the standard employed by the statutes and regulations to determine whether an impairment is "severe" at step two for purposes of social security disability insurance benefits, namely whether the impairment causes "a limitation or restriction having more than a minimal effect on an individual's ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *2 (July 2, 1996). Although Dr. Kakodkar was a treating source, the ALJ improperly relied on his completion of this form to give less weight to Dr. Gupta's opinion because Dr. Kakodkar's opinion that Plaintiff's obesity does not cause him to need continual help from another person to work is not inconsistent with Dr. Gupta's assessment that Plaintiff has some limitations in standing, walking, and certain postural activities as a result of his obesity. *See Browning v. Colvin*, 766 F.3d 702, 704 (7th Cir. 2014) (recognizing obesity as an additional impairment that imposes a limitation on ability to work for a person with mental retardation under Listing 12.05C).

Both the ALJ and the Commissioner note the comment in the Individualized Support Plan by vocational facilitator Zalikha Khamitzhanova that Plaintiff "admittedly lost a lot of weight over

the years," (AR 402 (citing (Ex. 18))); (Def. Br. 10). However, even at his lowest weight, Plaintiff's BMI was still 39. And, he was at this lowest weight when Dr. Gupta examined him and gave his Medical Source Statement imposing some limitations in walking, standing, and certain postural activities.

Contrary to Plaintiff's assertion, this is not a case in which the ALJ "played doctor" by substituting his own unqualified opinion for the opinion of a medical professional. Rather, for the reasons set forth above, substantial evidence does not support the "little weight" the ALJ gave to Dr. Gupta's Medical Source Statement. The Commissioner is correct that the ALJ is "'not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians.'" (Def. Br. 12 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)). However, the ALJ must properly weigh the consulting examiner's opinion, which he did not do in this case because the analysis is not supported by substantial evidence. The ALJ did not build the requisite logical bridge.

Plaintiff argues for reversal and an award of benefits. An award of benefits is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011); *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993).

In the first decision, the prior ALJ imposed physical limitations in the RFC without a finding that Plaintiff's obesity was "severe." Yet, now that the case has been remanded on that issue, and a consultative examiner imposed physical limitations resulting from obesity, the current ALJ rejected the consultative examiner's opinion on grounds not supported by the evidence. As set forth

above, there was no reasonable basis for the ALJ to reject the opinion of Dr. Gupta, a neutral doctor hired by the Commissioner. Neither the ALJ in his decision nor the Commissioner in his response brief disputes that Dr. Gupta's opinion, if credited, leads to a finding that Plaintiff's obesity is severe, which in turn, along with Plaintiff's diagnosis of mild mental retardation (IQ of 69) and adaptive deficits established prior to age 22, would mandate a finding of disability at step three under Listing 12.05C. When viewed as a whole, the history of the case makes it appear as though the Commissioner's decision process is outcome determinative.

Remand for further proceedings is unnecessary because the record supports only one conclusion—that Plaintiff is disabled under Listing 12.05C. Accordingly, reversal for an award of benefits is warranted.

In light of this ruling, it is unnecessary for the Court to consider Plaintiff's arguments regarding the credibility determination.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief requested in Plaintiff's Brief in Support of his Motion to Reverse the Decision of the Commissioner of Social Security [DE 17], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** the case for an award of benefits.

SO ORDERED this 29th day of February, 2016.

s/ Paul R. Cherry _____
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT